IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

S.M., individually and on behalf of all others similarly situated,

Plaintiff,

v.

PEACHY CORP. and CAROLYN TREASURE, MD,

Defendants.

**Case No. 1:25-cv-01141-FB-JAM**

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff S.M. ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself, which are based on personal knowledge.

**NATURE OF ACTION**

1. This is a class action lawsuit brought on behalf of all persons who have visited the website peachystudio.com (the "Website") and booked an appointment for botox treatment.

2. When booking a medical treatment online, patient privacy is crucial. Patients expect, as they should, that their private information will be held in confidence and not shared with third parties. The sensitive nature of information related to botox treatment amplifies the need for privacy during online bookings, as these procedures often involve sensitive details of a patent's individual appearance and body image. Such information can be emotionally charged and stigmatizing, making the protection of such data critical.

3. Peachy Corp. ("Peachy") owns and operates the Website, where patients can book botox treatments at one of its brick-and-mortar medical facilities.

**Figure 1:**




4. While this is the only service offered by Peachy, patients can book different botox types (e.g. Xeomin, Jeuveau, Botox, or Dysport) and different treatment focuses (e.g. eyes or jawline).

5. Peachy is owned and operated by Dr. Carolyn Treasure MD ("Dr. Treasure") (together with Peachy, "Defendants").

6. In addition to founding Peachy, Dr. Treasure also owns and operates Carolyn Treasure MD PC ("PC"). PC is an Affiliated Covered Entity and is responsible for providing treatment to patients scheduling botox appointments through Peachy.[1] As an Affiliated Covered Entity, PC represents that it complies with HIPAA requirements regarding patient privacy.

---

[1] https://peachystudio.com/pages/notice-of-privacy-practices.

7. Peachy serves as an agent of Dr. Treasure and PC for the booking of medical appointments.

8. Unbeknownst to Plaintiff and members of the putative class, and contrary to Defendants' duties as a medical provider, Defendants disclose their patients' protected health information ("PHI") to third parties, including Google, for targeted advertising purposes. Plaintiff brings this action for legal and equitable remedies resulting from Defendants' illegal actions.

## THE PARTIES

9. At all relevant times, Plaintiff was a resident of Brooklyn, New York. Plaintiff has been a patient of Peachy since 2022 and has made multiple appointments through its Website for botox treatment. Plaintiff created her account with Peachy in 2022 using her Gmail account and books her botox appointments while logged into her patient account. For example, on June 25, 2024, while logged into her patient account, Plaintiff scheduled an appointment for botox treatment through the Peachy Website. This appointment was scheduled for June 26, 2024, at Peachy's Williamsburg location.

10. Unbeknownst to Plaintiff, Defendants disclosed her PHI—including the fact that she was booking an appointment for botox treatment—to Google LLC ("Google") for targeted advertising purposes. Defendants also disclosed sufficient personally identifiable information ("PII") for Google to identify Plaintiff as the specific individual booking her medical appointment, as described more thoroughly below.

11. After booking an appointment on the Peachy Website, Plaintiff began receiving targeted advertisements for similar products and services. Plaintiff would not have booked an

appointment on the Website if she knew Defendants were violating her privacy by sharing her PHI with unknown third parties.

12. At all relevant times Plaintiff has maintained a Gmail account. When registering for her Gmail account, Google required that she provide her full legal name, date of birth, and gender. Every time Plaintiff accesses her Gmail account, Google collects information related to her IP address and electronic device (e.g. browser, operating system, screen resolution, etc.) and stores it in a profile maintained by Google for targeted advertising purposes. Google also utilizes other features, such as generating specific User IDs, to track its users across web browsing sessions for identification purposes, as detailed below. Google utilizes all of these tracking features in order to build robust consumer profiles it can then leverage for targeted advertising purposes.

13. Peachy Corp. is a Delaware corporation with its principal place of business in New York, New York. Peachy owns and operates a professional network of brick-and-mortar medical clinics that specialize in botox treatment.

14. Dr. Carolyn Treasure MD is a medical professional licensed to practice medicine in New York, the District of Columbia, Texas, and Illinois.[2] Dr. Treasure is the founder and CEO of Peachy, as well as the founder of Carloyn Treasure MD PC and is based in New York, New York. Dr. Treasure controls all operations for Peachy and PC, including but not limited to their marketing and data sharing practices.

15. Defendants develop, own, and operate the Website, which is used by consumers throughout New York, the District of Columbia, Chicago and Austin, to book appointments for botox treatment. Defendants chose to embed tracking technology on the Website, whereby they

[2] https://www.docinfo.org/doctor-profile/6ec4cef4-a14d-443e-8412-72884a021b28

shared the confidential medical information of their patients with Google for targeted advertising purposes. Defendants did this without authorization or consent from their patients.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from at least one defendant.

17. This Court has personal jurisdiction over Defendants because Defendants conduct substantial business within this District.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A. Health-Related Information is Sensitive and Confidential

19. Defendants assisted Google, one of the largest data and technology companies in the world, with intercepting information that is sensitive, confidential, and personally identifiable.

20. Defendants operate a network of medical clinics through New York state, the District of Columbia, Chicago, and Austin.

21. Under federal law, a healthcare provider may not disclose personally identifiable information ("PII") or protected health information ("PHI") without the patient's express written

authorization.[3] In this case, PHI includes, but is not necessarily limited to, information pertaining to botox appointments and treatments.

22. The United States Department of Health and Human Services ("HHS") has established a national standard, known as the HIPAA Privacy Rule, to explain the duties healthcare providers owe to their patients. "The Rule requires appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization."[4]

23. A healthcare provider violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-d9 ("Part C"): "(1) uses of causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual."[5]

24. The statute states that an entity "shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity…and the individual obtained or disclosed such information without authorization." *Id.*

25. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendants because they are knowingly disclosing individually identifiable health information relating to their patients.

26. Defendants further failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI that

[3] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 165.508(a), 164.514(b)(2)(i).

[4] U.S. Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

[5] 42 U.S.C. § 1320d-6.

Defendants created, received, maintained and transmitted in violation of 45 C.F.R. Section 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.R.F. Section 164.308(a)(1);

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendants in violation of 45 C.F.R. Section 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. Section 306(a)(2);

e. Failing to protect against reasonably anticipated uses of disclosures of electronic PHI not permitted under privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. Section 164.306(a)(3); and

f. Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. Section 164.530(c).

27. Health care organizations regulated under HIPAA, like Defendants, may use third-party tracking tools in a limited way to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to vendors (as shown below). As explained by a statement published by the HHS:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would

> result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. **For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures**.[6]

28. The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[7]

29. Plaintiff and Class Members face exactly the risks about which the government expresses concern. Defendants' unlawful conduct resulted in third parties intercepting information regarding Plaintiff and Class Members' botox appointments and treatments when logged into their patient portal on Defendants' Website.

30. The Bulletin goes on to make clear how broad the government's view of protected information is. It explains:

> This information might include an individual's medical record number, home or email address, or **dates of appointments**, as well as **an individual's IP address** or geographic location, medical

[6] HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (THE "BULLETIN") (EMPHASIS ADDED), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[7] *Id.* (emphasis added).

> device IDs, **or any unique identifying code**.[8]

31. Crucially, the Bulletin continues:

> **All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI**, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, **such as IP address** or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus **relates to the individual's past, present, or future health or health care** or payment for care.[9]

32. Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.
>
> "When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

---

[8] *Id.* (emphasis added).

[9] *Id.* (emphasis added).

> "Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."
>
> The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.
>
> In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, **medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment**.[10]

33. The FTC is unequivocal in its stance. The FTC has specifically informed healthcare companies, like Defendants, that they should not use tracking technologies to collect sensitive health information and disclose it to third party advertising platforms without informed consent:

> The FTC Act prohibits companies and individuals from engaging in unfair or deceptive acts or practices in or affecting commerce. This means you must ensure your health data practices aren't substantially injuring consumers, including by invading their privacy.

---

[10] Federal Trade Commission, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, July 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking. (emphasis added).

> For instance, *BetterHelp*, *GoodRx*, and *Premom* make clear that disclosing consumers' health information for advertising without their affirmative express consent may be an unfair practice.
>
> [I]f you use behind-the-scenes tracking technologies that share consumers' sensitive health data in contradiction of your privacy promises, that's a violation of the FTC Act.[11]

34. Therefore, Defendants' conduct, as described herein, is directly contrary to federal law and the clear pronouncements by the FTC and HHS.

**B. Google's Advertising Technology**

35. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (e.g. Chrome, Safari, Edge, etc.).

36. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

37. Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- <u>HTTP Request</u>: an electronic communication sent from a device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- <u>Cookies</u>: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party

[11] https://www.ftc.gov/business-guidance/resources/collecting-using-or-sharing-consumer-health-information-look-hipaa-ftc-act-health-breach

cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

38. A consumers' HTTP Request essentially asks the Website to retrieve certain information (such as appointment booking information), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

39. Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

40. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. The tracking technologies embedded on the Website by Defendants constitute Source Code and function is a substantially similar way.

41. Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

42. Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[12] In 2020, Google generated $146.9 billion in advertising

[12] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

**Figure 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $257.6 billion | $209.5 | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

43. Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue. For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

44. One of these SDKs and tracking pixels is Google Analytics. Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis. In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions. Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

45. Google continued updating its analytics platform, launching Universal Analytics in 2012. Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior. Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a

persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

46. In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

47. Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

48. Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[13] It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[14]

49. Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when Peachy users are logged into their account portals. This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on. The code also collects PII, such as IP addresses and device information

---

[13] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 10, 2023).

[14] *Id.*

related to the specific computing device a consumer (or patient) is using to access a website. The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

50. In other words, when interacting with the Website, an HTTP Request is sent to Peachy's server, and that server sends an HTTP Response including the Markup that displays the website visible to the patient and Source Code, including Google's tracking technologies.

51. Thus, Defendants are essentially handing their patients a tapped device, and once the webpage is loaded onto the patient's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Defendants and transmits those communications to third parties like Google.

52. Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google Analytics for processing. Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

53. After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age,

location, language, and gender, along with interests they express through their online browsing and purchase activities).

54. In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

55. Google Analytics links with Google Ads so that Google may use the data intercepted by Google Analytics to be utilized for targeted advertising purposes.[15] Such practices were in effect on the Peachy Website at all relevant times.

56. The Website utilizes Google's pixel and SDK. As a result, Google intercepted patients' interactions on the Website, including their PII and PHI. Google received at least "Custom Events" and URLs that disclosed the botox treatment being received by the patient. Google also received additional PII, including the patients' IP address, device information, and User-IDs.

57. For example, the Website utilizes Google's "ecid" or "Enhanced Client ID" function to identify users as they navigate the Peachy Website.[16]

58. The Website also utilizes Google's "auid" or "Advertiser User ID" and "guid" or "Globally Unique Identifier" cookies, which identify unique users and unique interactions with a website.

59. In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers. A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

---

[15] https://support.google.com/analytics/answer/9379420?hl=en#zippy=%2Cin-this-article

[16] https://www.bbccss.com/enhanced-client-id.html#Client_ID_VS_Enhanced_Client_ID

60. These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.

61. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[17]

62. The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[18] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

63. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[19]

64. Browser-fingerprints are personal identifiers. Tracking technologies, like the ones developed by Google and utilized on the Website, can collect browser-fingerprints from website visitors.

65. As enabled by Defendants, Google collects vast quantities of consumer data through its tracking technology.

---

[17] https://www.blog.google/products/chrome/building-a-more-private-web/

[18] https://www.pixelprivacy.com/resources/browser-fingerprinting/

[19] https://ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

66. Due to the vast network of consumer information held by Google, it is able to match the IP addresses, device information, and User-IDs it intercepts and link such information to an individual's specific identity.

67. Google then utilizes such information for its own purposes, such as targeted advertising.

**C. Defendants Violate the Privacy Rights of Their Patients**

42. Botox treatment is a medical procedure surging in popularity. In 2022, the global botox industry was valued at over $6 billion.[20] By 2030, the global market is expected to exceed $15 billion.[21]

43. Botox treatment is recognized as a medical procedure in New York.[22]

44. Defendants understand that the information handled on the Peachy Website is protected and confidential. For example, Defendants represent to their patients that "Without your authorization, we are expressly prohibited from using or disclosing your protected health information for marketing purposes."[23] Unfortunately, Defendants do not comply with their obligations and representations.

---

[20] https://www.thebrainyinsights.com/report/botox-market-13252#:~:text=Market%20Introduction,USD%2015.2%20billion%20by%202030.

[21] *Id.*

[22]https://dos.ny.gov/system/files/documents/2024/05/beauty_salon_0.pdf#:~:text=Such%20services%20are%20the%20practice,by%20a%20licensed%20medical%20professional.&text=Licensed%20cosmetologists%20and%20estheticians%20may,regulated%20by%20New%20York%20State ("All appearance enhancement licensees are prohibited from providing injections of any substance, such as **Botox**, Restylane **or other fillers**[.] **Such services are the practice of medicine and should only be provided by a licensed medical professional**.") (emphasis added).

[23] https://peachystudio.com/pages/notice-of-privacy-practices

45. Defendants allow their patients to book appointments through the Peachy Website to schedule and purchase botox treatment.

46. Unbeknownst to their patients, Defendants embedded Google's tracking technologies onto the Website, including after patients have logged into their account portals, to schedule and purchase appointments for botox treatment.

47. After signing into their account portal, patients can book botox treatment at any of the medical facilities operated by Defendants.

48. To start, patients select "Book Now" on Defendants' homepage:

**<u>Figures 2-4:</u>**



Full Request

Full call

https://analytics.google.com/g/collect?v=2&tid=G-
V6NLX2QEP0&gtm=45je52o0v885356008z8849259423za200zb849259423&_p=1740611773377&gc
s=G111&gcd=13t3t3t3t5l1&npa=0&dma=0&tag_exp=101732282~101732284~102067808~102482
433~102539968~102558064~102587591~102605417~102640600~102658453~102732003&gdi
d=dYmNjMT.dNTU0Yz&cid=154902689.1738159361&ecid=370790296&ul=en-
us&sr=2560x1440&ir=1&uaa=x86&uab=64&uafvl=Not(A%253ABrand%3B99.0.0.0%7CGoogle%2520
Chrome%3B133.0.6943.141%7CChromium%3B133.0.6943.141&uamb=0&uam=&uap=Windows&ua
pv=15.0.0&uaw=0&are=1&pae=1&frm=0&pscdl=noapi&_eu=EA&_s=4&sid=1740611772&sct=12&se
g=1&dl=https%3A%2F%2Fpeachystudio.com%2Fpages%2Fbook&dr=https%3A%2F%2Fpeachystudi
o.com%2F&dt=Book%20an%20appointment%20%7C%20Peachy&en=viewCustomerType&_et=1&tfd
=323

Full Request

Full call

https://googleads.g.doubleclick.net/pagead/viewthroughconversion/604435984/?
random=1740611773746&cv=11&fst=1740611773746&bg=ffffff&guid=ON&async=1&gtm=45be52b0
v9172016179za200&gcd=13t3t3t3t5l1&dma=0&tag_exp=101732279~101732281~102067808~10
2482433~102539968~102558064~102587591~102605417~102640600~102658453&u_w=2560&
u_h=1440&url=https%3A%2F%2Fpeachystudio.com%2Fpages%2Fbook&ref=https%3A%2F%2Fpeac
hystudio.com%2F&hn=www.googleadservices.com&frm=0&tiba=Book%20an%20appointment%20%
7C%20Peachy&did=dNTU0YZ%2CdYmNjMT&gdid=dNTU0YZ.dYmNjMT&rdp=0&npa=0&pscdl=noapi
&auid=376817768.1738159361&uaa=x86&uab=64&uafvl=Not(A%253ABrand%3B99.0.0.0%7CGoogl
e%2520Chrome%3B133.0.6943.141%7CChromium%3B133.0.6943.141&uamb=0&uam=&uap=Wind
ows&uapv=15.0.0&uaw=0&fledge=1&data=event%3Dgtag.config&rfmt=3&fmt=4

49. When patients make this selection (as well as throughout the booking process) Defendants share their patients' PII and PHI with their advertising partner, Google. The information shared by Defendants allows Google to know the identities of specific individuals as well as information related to the botox treatment they are receiving. This allows these companies, including Defendants, to profit from this information for targeted advertising purposes.

50. For example, when a patient books an appointment for botox, Defendants assist Google in intercepting the information related to their appointment, including the location of their appointment, the date and time of their appointment, and whether the patient is a returning or new client, as shown below in Figures 5-6:

**Figures 5-6:**







51. Defendants further assist Google by disclosing the PII of its patients sufficient for Google to uncover their identities. In both HTTP communications, like Figures 3, 4, and 6, the patient's IP address is inherently included in every network request. In addition to its patients' IP addresses, Defendant, through Google's tracking technologies, disclosed information about

their specific devices and User-IDs to Google, allowing Google to link such information to an individual's specific identity.

52. As shown above, Plaintiff's communications with Defendants were disclosed by Defendants to Google and/or intercepted in transit by Google, in real time, via detailed URLs, which contain the medically sensitive information and personally identifiable information entered into the Website.

53. Defendants also use and cause the disclosure of data sufficient for Google to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications concerning individual medical appointments.

54. Defendants sent these identifiers (e.g. ecid, auid, guid, IP address, and device information) with each patient's "event" data.

55. Such event data includes the fact that a patient is seeking medical treatment (i.e. botox), the location of the appointment, the date and time of the appointment, and whether the patient is a new or returning patient. *See* Figure 6.

56. When patients share their personal information with medical professionals, they expect this information to be kept confidential. Moreover, when consumers seek a specific treatment from medical professionals, they also expect this highly sensitive information to be kept confidential.

57. If patients knew that Defendants were sharing their personal information for targeted advertising purposes, they seek treatment with another company. Through the above-listed third party tracking services, which Defendants used via the software code installed, integrated and embedded into the Website, Defendants disclosed their patients' legally protected PII and PHI.

58. By installing, integrating and embedding the above-listed tracking technologies into the Website, and by directing such installation, integration and embedding, Defendants aided and conspired with the third parties and others to allow those third-party entities to contemporaneously and surreptitiously intercept the Website communications of Defendants' patients without the patient's consent.

59. Defendants engage in this deceptive conduct for their own profit at the expense of their patients' privacy. Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violate federal and state law.

## CLASS ACTION ALLEGATIONS

60. Plaintiff brings this action on behalf of all persons in the United States who booked an appointment on peachystudio.com (the "Class").

61. Excluded from the Class are Defendants, the officers and directors of the Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendants have or had a controlling interest.

62. Plaintiff is a member of the Class she seeks to represent.

63. The Class is so numerous that joinder of all members is impractical. Although Plaintiff does not yet know the exact size of the Class, it is believed that there are at least thousands of Class members.

64. The Class is ascertainable because the Class members can be identified by objective criteria – all individuals who booked an appointment on peachystudio.com. Individual notice can be provided to Class members "who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

65. There are numerous questions of law and fact common to the Class, which predominate over any individual actions or issues, including but not limited to:

A. Whether Defendants gave the Class members a reasonable expectation of privacy that their information was not being shared with third parties;

B. Whether Defendants' disclosure of information constitutes a violation of the claims asserted;

C. Whether Plaintiff and Class members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

D. Whether Plaintiff and Class members have sustained damages as a result of Defendants' conduct and if so, what is the appropriate measure of damages or restitution.

66. Plaintiff's claims are typical of the claims of the members of the Class, as all members are similarly affected by Defendants' wrongful conduct. Plaintiff has no interests antagonistic to the interests of the other members of the Class. Plaintiff and all members of the Class have sustained economic injury arising out of Defendants' violations of common and statutory law as alleged herein.

67. Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained counsel competent and experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

68. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and Class members. Each individual Class member may

lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims are consistently adjudicated.

69. Plaintiff reserves the right to revise the her allegations and class definition based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CAUSES OF ACTION

### COUNT I
### Violation of the Electronic Communications Privacy Act
### 18 U.S.C. § 2511(1), *et seq.*

70. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

71. Plaintiff brings this claim on behalf of herself and members of the Class.

72. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

73. The ECPA protects both sending and the receipt of communications.

74. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

75. The transmission of Plaintiff's PII and PHI to Defendants' Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

76. The transmission of PII and PHI between Plaintiff and Class members and Defendants' Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

77. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

78. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

79. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

80. The following instruments constitute "devices" within the meaning of the ECPA:

a. The computer codes and programs Defendants and Google used to track Plaintiff and Class members communications while they were navigating

the Website;

b. Plaintiff's and Class members' browsers;

c. Plaintiff's and Class members' mobile devices;

d. Defendants' and Google's web and ad servers;

e. The plan Defendants and Google carried out to effectuate the tracking and interception of Plaintiff's and Class members' communications while they were using a web browser to navigate the Website.

81. Plaintiff and Class members' interactions with Defendants' Website are electronic communications under the ECPA.

82. By utilizing and embedding the tracking technology provided by Google on its Website, Defendants intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class members in violation of 18 U.S.C. § 2511(1)(a).

83. Specifically, Defendants intercepted—in real time—Plaintiff's and Class members' electronic communications via the tracking technology provided by Google on its Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and PHI to third parties, such as Google.

84. Defendants intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class members regarding PII and PHI, including their identities and information related to their botox appointments. This confidential information is then monetized for targeted advertising purposes, among other things.

85. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class members' electronic communications to affiliates and other third parties, while knowing or

having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

86. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

87. Defendants intentionally intercepted the contents of Plaintiff's and Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, HIPPA, the FTC Act, and invasion of privacy, among others.

88. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendants violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the

individual.[24]

89. Plaintiff's information that Defendants disclosed to Google qualifies as IIHI, and Defendants violated Plaintiff's and Class members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6. Defendants used the electronic communications to increase their profit margins. Defendants specifically used the tracking technology provided by Google to track and utilize Plaintiff's and Class members' PII and PHI for financial gain.

90. Defendants were not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

91. Plaintiff and Class members did not authorize Defendants to acquire the content of their communications for purposes of invading Plaintiff's and Class members' privacy. Plaintiff and Class members, all of whom are patients of Defendants, had a reasonable expectation that Defendants would not redirect their communications to Google without their knowledge or consent.

92. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

93. As a result of each and every violation thereof, on behalf of herself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, et seq. under 18 U.S.C. § 2520.

## COUNT II
## Negligence

94. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

---

[24] 42 U.S.C. § 1320d-6.

95. Plaintiff brings this claim on behalf of herself and members of the Class against Defendants.

96. Upon accepting, storing and controlling the PHI and PII of Plaintiff and the Class, Defendants owed—and continue to owe—a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard and protect their highly sensitive PHI and PII.

97. Defendants breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PHI and PII from unauthorized disclosure.

98. It was reasonably foreseeable that Defendants' failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PHI and PII through their use of the tracking technology would result in unauthorized third parties—such as Google—gaining unlawful access to such information.

99. Defendants' duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' PHI and PII arose due to the special relationship that existed between Defendants and their patients, which is recognized by statute and common law.

100. Defendants separately had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of patients' medical-related information and set forth the conditions under which such information can be used and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

101. Defendants had an additional, separate duty under the FTC Act to not disclose its patients' PII and PHI.

102. Defendants' own conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their PHI and PII. Defendants' misconduct included the failure to: (i) secure Plaintiff's and Class Members' Private Information; (ii) comply with industry-standard data security practices; (iii) implement adequate Website and event monitoring and (iv) implement the systems, policies and procedures necessary to prevent unauthorized disclosures resulting from the use of the tracking technology implemented by Defendants.

103. As a direct result of Defendants' actions, including but not limited to the disclosure of Plaintiff's and Class Members' PHI and PII, Plaintiff and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, and emotional distress.

104. Defendants' wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information constituted (and continues to constitute) negligence at common law.

105. Plaintiff and the Class are entitled to recover damages in an amount to be determined at trial.

## COUNT III
## Invasion of Privacy

106. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

107. Plaintiff brings this claim on behalf of herself and members of the Class against Defendants.

108. The highly sensitive and personal information of Plaintiff and Class Members consists of private and confidential facts and information regarding Plaintiff's and Class Members' medical treatments that were never intended to be shared beyond private communications on the Website and the consideration of health professionals.

109. Plaintiff and Class Members had a legitimate expectation of privacy regarding their PHI and PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties, including but not limited to Google.

110. Defendants owed a duty to Plaintiff and Class Members to keep their PHI and PII confidential.

111. Defendants' unauthorized disclosure of Plaintiff's and Class Members' PHI and PII to Google, a third-party technology and marketing giant, is highly offensive to a reasonable person.

112. Defendants' willful and intentional disclosure of Plaintiff's and Class Members' PHI and PII constitutes an intentional interference with Plaintiff's and Class Members' interest in solitude and/or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

113. Defendants' conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class Members' privacy because Defendants facilitated the Google's simultaneous eavesdropping and wiretapping of confidential communications.

114. Defendants failed to protect Plaintiff's and Class Members' PHI and PII and acted knowingly when they installed the tracking technology onto the Website because the purpose of said technology is to track and disseminate users' communications on the Website for marketing and advertising.

115. Because Defendants intentionally and willfully incorporated the tracking technology onto the Website and encouraged individuals to use and interact with the Website and the services thereon, Defendants had notice and knew that their practices would cause injury to Plaintiff and the Class.

116. As a proximate result of Defendants' acts and omissions, the PII and PHI of Plaintiff and Class Members was disclosed to unauthorized third parties, causing Plaintiff and the Class to suffer damages.

117. Plaintiff, on behalf of herself and Class members, seeks compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, loss of time and opportunity costs, lost benefit of the bargain and pre-judgment interest and costs.

118. Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PHI and PII is still maintained by Defendants and still in the possession of unauthorized third parties, and the wrongful disclosure of this information cannot be undone.

119. Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendants' and unauthorized third parties' continued possession of their sensitive and confidential information. A judgment for monetary damages will not undo Defendants' disclosure of the information to unauthorized third parties who, upon information and belief, continue to possess and utilize the information.

120. Plaintiff, on behalf of herself and Class members, further seeks injunctive relief to enjoin Defendants from intruding into the privacy and confidentiality of Plaintiff's and Class

Members' PHI and PII and to adhere to its common law, contractual, statutory and regulatory duties.

**COUNT IV**
**Breach of Implied Contract**

121. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

122. Plaintiff brings this claim on behalf of herself and members of the Class against Defendants.

123. Defendants required Plaintiff and Class Members to provide their private information, including names, email addresses, phone numbers, computer IP addresses, appointment information and other content submitted to or obtained by Defendants' Website as a condition of their receiving medical services.

124. When Plaintiff and Class Members provided their data to Defendants in exchange for services, they entered into an implied contract pursuant to which Defendants agreed to safeguard and not disclose their PHI and PII without consent.

125. Plaintiffs and Class Members accepted Defendants' offers and provided their PHI and PII to Defendants.

126. Plaintiffs and Class Members fully performed their obligations under the contract with Defendant.

127. Defendants' relevant privacy policies and representations require Defendants to take appropriate steps to safeguard the private information entrusted to it by the Plaintiff and Class Members.

128. Defendants breached these agreements, which directly and/or proximately caused Plaintiff and Class Members to suffer damages, including nominal damages.

129. Plaintiff and Class Members would not have entrusted Defendants with their PHI and PII in the absence of an implied contract between them and Defendants obligating Defendants not to disclose this information without consent.

130. Defendants breached these implied contracts by disclosing Plaintiff's and Class Members' PHI and PII to a third party like Google.

131. As a direct and proximate result of Defendants' breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein. Plaintiff and Class Members would not have used Defendants' services had they known their private information would be disclosed.

132. Plaintiff and Class Members are entitled to compensatory and consequential damages because of Defendants' breach of implied contract.

**COUNT V**
**Breach of Fiduciary Duty**

133. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

134. Plaintiff brings this claim on behalf of herself and members of the Class.

135. A relationship existed between Plaintiff and Class Members on the one hand and Defendants on the other in which Plaintiff and Class Members put their trust in Defendants to protect their PHI and PII, and Defendants accepted that trust.

136. Defendants breached the fiduciary duty that it owed to Plaintiff and Class Members by failing to act with the utmost good faith, fairness and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, the PHI and PII of Plaintiff and Class Members.

137. Defendants' breach of fiduciary duty was a legal cause of damage to Plaintiff and Class Members.

138. But for Defendants' breach of fiduciary duty, the damage to Plaintiff and Class Members would not have occurred.

139. Defendants' breach of fiduciary duty contributed substantially to producing the damage to Plaintiff and Class Members.

140. As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiff and Class Members are entitled to and do demand actual, consequential and/or nominal damages, injunctive relief, and all other relief allowed by law.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a. Determining that this action is a proper class action;

b. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class and naming Plaintiff's attorneys as Class Counsel to represent the Class;

c. For an order declaring that Defendants' conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

e. Award compensatory damages, including statutory damages where available, to Plaintiff and the Class members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

f. Ordering Defendants to disgorge revenues and profits wrongfully obtained;

g. For prejudgment interest on all amounts awarded;

h. For injunctive relief ordering Defendants to immediately cease their illegal conduct;

i. For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

j. Grant Plaintiff and the Class members such further relief as the Court deems appropriate.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims so triable in this action.

Dated: March 24, 2025

Respectfully submitted,

By: */s/ Alec Leslie*

**BURSOR & FISHER, P.A.**
Alec M. Leslie
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: aleslie@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*pro hac vice* forthcoming)
701 Brickell Ave., Suite 2100
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 676-9006
E-Mail: sbeck@bursor.com

*Attorneys for Plaintiff*